IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA A. FULKS,<br><br>    Plaintiff,<br><br>v.<br><br>JOANNE B. BARNHART,<br><br>    Defendant.<br>_____ / | No. C 04-3219 MJJ<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

Before the Court are cross-motions for summary judgment in a Social Security appeal brought by Theresa A. Fulks ("Plaintiff") and Joanne B. Barnhart, Commissioner of the Social Security Administration ("Defendant"). These motions require the Court to determine if (1) substantial evidence exists in support of the Administrative Law Judge's ("ALJ") decision, and (2) correct legal standards were applied. For the reasons set forth below, the Court **DENIES** Defendant's motion and **GRANTS** Plaintiff's motion.

## FACTUAL BACKGROUND

Plaintiff, a 48 year-old, 5 foot 3 inches, 280 pound woman at the time of her ALJ hearing on October 31, 2003, is a high school graduate who attended two years of college. Her prior work experience consists of over 14 years as both an employee and manager of a concessions stand at the Oakland Coliseum. Through her work, she earned sufficient quarters of Social Security coverage to remain insured until December 31, 2000, her Date Last Insured ("DLI").

Plaintiff filed her application for a period of disability and disability insurance benefits on

1  October 17, 2002, alleging disability beginning on January 1, 1998. On her behalf, Plaintiff's
2  attorney amended Plaintiff's application to allege disability beginning on September 27, 1995.
3  Plaintiff based her claim for disability on lupus, obesity, depression, peripheral neuropathy,
4  hypertension, fibromyalgia syndrome, numbness of hands and arms, rheumatoid arthritis, facial and
5  skin rashes, sensitivity to sunlight and status post abrasion arthroplasty of the medial femoral
6  condyle. In addition, prior to her DLI, Plaintiff experienced episodes of extreme fatigue, exhaustion,
7  joint pain and swelling, chest pain, lung inflammation, irritable bowel syndrome, continued pain
8  following a previous shoulder surgery, and has alleged difficulty with concentration.

9  In 1995, Plaintiff injured her right knee on the job, and in July 1997, Plaintiff had surgery to
10 repair the knee. While she had improved motion and decreased swelling in the knee following
11 surgery, the pain remained. Dr. Timmerman opined then that she would be unable to return to her
12 concession job nor any other standing work based on her knee and previous back injuries.

13 Medical records indicate that Plaintiff sought treatment for left forefoot pain on March 4,
14 1999. The pain was the result of wearing inexpensive tennis shoes that lacked padding, aggravated
15 by her obesity, and doctors noted that Plaintiff had similar problems previously caused by standing
16 at work on a hard concrete floor. Doctors administered a local steroid injection which helped at the
17 time. On April 12, 2000, Plaintiff reported two weeks of right foot pain to Dr. White, which on May
18 3, 2000, an x-ray showed to be caused by a bone spur. Plaintiff had continued trouble with her feet
19 from January to March 2001. Only one week after her DLI, Dr. Coulter noted a year-long history
20 and escalation of pain during 2000, and that Plaintiff had unequal sensation and reflexes in her legs,
21 feet and toes.

22 On March 25, 1999, Plaintiff reported to Dr. White, one of Plaintiff's regular treating
23 physicians, that she had experienced "pressure like" chest pains two to three times in the previous
24 weeks. Dr. White assessed Plaintiff with borderline hypertension and referred her to a specialist.
25 On May 3, 1999, Dr. Hallinan, a cardiologist, noted Plaintiff as "very obese" with hypertension and
26 atypical chest pain. Although Plaintiff did not have coronary artery disease, doctors placed her on a
27 1,500 calorie diet but Plaintiff was unable to increase her walking exercise due to her previous foot
28

and knee injuries. (Doctors also prescribed Plaintiff medication to help control her hypertension.

Plaintiff also currently suffers from systemic lupus erythromatosis ("SLE"). In May 2001, a positive Antinuclear Antibody (ANA) test, and other tests in August 2001, showed the presence of an autoimmune disorder. Although doctors did not conclusively diagnose her with SLE until late August, early September of 2001, Plaintiff and her doctors claim that presenting symptoms of her SLE existed in 1998-99, well before her DLI. When Dr. Kaye in Rheumatology at the Highland Hospital made the formal diagnosis of SLE in September 2001, he noted Plaintiff's record had over a year history of facial rash and photosensitivity, two years of multiple arthralgias, especially in the feet, two years of severe lethargy, and over a year of chest pain and breathing complications, all signs that Plaintiff had SLE well before official diagnosis.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate if there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. A dissatisfied Social Security claimant may seek judicial review in federal district court, under 42 U.S.C. sections 405(g) and 421(d), after exhausting administrative remedies. *Schweiker v. Chilicky*, 487 U.S. 412, 424 (1988). The Court may disturb the Commissioner's final decision "only if it is based on legal error or if the fact findings are not supported by substantial evidence." *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992). Substantial evidence is more than a mere scintilla, but less than a preponderance. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). "[C]onsidering the entire record, [substantial evidence] is relevant evidence which a reasonable person might accept as adequate to support a conclusion." *Matthews v. Shalala*, 10 F.3d 678, 679 (9th Cir. 1993). Determinations of credibility, resolution of conflicts in medical testimony, and all other ambiguities are to be resolved by the ALJ. *Magellanes*, 881 F.2d at 750. The decision of the ALJ will be upheld if the evidence is "susceptible to more than one rational interpretation." *Andrews v. Shalala*, 53 F.3d 1035, 1040 (9th Cir. 1995).

**ANALYSIS**

To qualify for Title II and Title XVI benefits, a claimant must establish a medically determinable physical or mental impairment that is expected to result in death or last for a continuous period of at least twelve months that prevents her from engaging in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). In addition, to establish a disability, an individual "must show that he is precluded from engaging not only in his 'previous work,' but also from performing 'any other kind of substantial gainful work that exists in the national economy.'" *Matthews*, 10 F.3d at 680; 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled and entitled to benefits, the ALJ conducts a five-step sequential inquiry. 20 C.F.R. §§ 404.1520, 415.920. In the first step, the ALJ considers whether the claimant is currently engaged in substantial gainful activity. If not, the ALJ assesses whether the claimant has a severe impairment. In step three, the ALJ determines whether the claimant has a condition which meets or equals the conditions outlined in the Listings of Impairments in Appendix 1, Subpart P, Regulation 4. 20 C.F.R. § 404.1520. If the claimant does not have such a condition, step four requires the ALJ to determine whether the claimant has the Residual Functional Capacity ("RFC") to perform her past relevant work. If not, in step five, the ALJ considers whether the claimant has the ability to perform other work which exists in substantial numbers in the national economy. 20 C.F.R. §§ 404.1520(b)-(f), 404.920(b)-(f).

Here, the ALJ conducted the five-step sequential inquiry and found that Plaintiff was not disabled. The ALJ found that Plaintiff had not engaged in any substantial or gainful activity since September 27, 1995. The ALJ acknowledged only a few of Plaintiff's alleged ailments, finding only her obesity and right knee injury to be "severe." Because Plaintiff's doctors did not conclusively diagnose Plaintiff with SLE prior to her DLI, the ALJ ignored medical evidence before and or around her DLI that Plaintiff suffered from hypertension, lethargy, shoulder pain, depression, swollen ankles and skin disorders, all potentially related to SLE. Taking into account only Plaintiff's obesity and knee injury in Step Three, the ALJ did not find that Plaintiff suffered from any impairment listed or medically equivalent to those found at 20 C.F.R., Part 404, Appendix 1 to

Subpart P of the Social Security Regulations No. 4.  Furthermore, while the ALJ found Plaintiff unable to return to her previous work at the concession stand in step four, he found that prior to her DLI she "was able to perform a full range of sedentary work, as defined at 20 C.F.R. § 404.1567(a)."

Plaintiff challenges the ALJ's findings on three grounds:  (1) whether the ALJ improperly found Plaintiff's condition was not severe because he neglected to consider the combined effects of all her impairments; (2) whether the ALJ improperly rejected and discounted the opinions of treating physicians; and (3) whether the ALJ improperly discounted Plaintiff's testimony and statements regarding her symptoms.

**A.    The ALJ's Consideration of All of Plaintiff's Impairments in Determining Severity**

Plaintiff argues that the ALJ erred when determining the severity of Plaintiff's ailments by focusing only on her obesity and knee injury.  Defendant argues that the ALJ did take into account Plaintiff's foot pain caused by inexpensive shoes, her improved depression following the death of her sister, and her shoulder pain and numbness.  Plaintiff responds that the combined effect of impairments considered by the ALJ should have included the fatigue, pain, numbness, and other initial signs of SLE, the foot pain, persistent knee and shoulder pain, and the effects of depression.

In determining whether physical or mental impairments are of sufficient medical severity to be the basis of eligibility under the law, the ALJ must consider the combined effects of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  *See* 20 C.F.R. § 404.1523.  Upon a review of the record, it appears that the ALJ ignored evidence in the medical record, prior to her DLI, of Plaintiff's symptoms of SLE and other afflictions, such as foot impairments, fatigue and trouble sleeping, swollen and painful joints, hypertension and chest pain, numbness, shoulder pain, headaches and migraines, and depression.  In determining whether Plaintiff suffered from any impairment that is either listed in, or medically equivalent to one listed in the Listings of Impairments found at 20 C.F.R., Part 404, Appendix 1 to Subpart P of the Social Security Regulations No. 4, the ALJ was required to consider all of the aforementioned afflictions.  His failure to consider these afflictions supports Plaintiff's assertion that

the ALJ's findings were erroneous.

Furthermore, because doctors did not conclusively diagnose Plaintiff with SLE until after her DLI, the ALJ apparently disregarded the possibility that Plaintiff had SLE prior to her DLI. To be certain, the ALJ did not consider the symptoms and afflictions Plaintiff suffered from before her DLI that doctors related to SLE. The ALJ held that because there was "no evidence in the claimant's medical records to support a finding that lupus . . . imposed more than a minimal limitation on her work capacity," he did not find it "severe" and failed to cumulate the effects of SLE on Plaintiff. (Administrative Transcript ("Tr.") at 15.)

However, SLE is specifically listed as a disabling disease at section 14.02. 20 C.F.R., Part 404, Appendix 1 to Subpart P of the Social Security Regulations No. 4. SLE attacks nearly every body part and system. *Id.* As listed in section 14.02, Plaintiff's medical records clearly demonstrate that she suffered a slow onset of facial rashes, extensive joint pain, irritable bowel syndrome, sensitivity to sunlight, neuropathy, depression, and extreme fatigue, all prior to her DLI. Furthermore, the opinions of Dr. Alavarez and Dr. Neuwelt both state that Plaintiff would have been unable to perform even sedentary work before her DLI due to SLE. Given these findings, the ALJ's failure to evaluate these facts in conjunction with the evidence in the record in determining the severity of Plaintiff's ailments constitutes error.

Additionally, the effects of Plaintiff's obesity, though no longer a listed impairment by itself, must be cumulated with each of Plaintiff's other afflictions, not just with the afflictions that the ALJ labels as "severe." *See* § 1.00Q to the Listing of Impairments. Here, the ALJ only combined and considered the effects of Plaintiff's obesity and her knee surgery to find that she could have performed sedentary work. Instead, the ALJ was required to take into account the effect that Plaintiff's obesity had on all of her impairments, including her feet, numbness, depression, fatigue, hypertension, and SLE.

In sum, the ALJ's failure to cumulate Plaintiff's afflictions beyond her knee injury and obesity is reversible error. Furthermore, the ALJ should not have ignored the multitude of afflictions in Plaintiff's medical record related to her SLE merely because doctors affirmatively

6

1  diagnosed the disease after her DLI.  Accordingly, the Court finds that the ALJ failed to properly
2  consider all of Plaintiff's afflictions in determining whether she was disabled prior to her DLI.

3  **B.    Opinions of Treating Physicians Neuwelt and Alvarez**

4  Plaintiff argues that the ALJ improperly rejected the opinions of Dr. Neuwelt and Dr.
5  Alvarez without citing *clear and convincing* reasons for doing so.  Defendant argues that the ALJ
6  provided several *specific and legitimate* reasons for rejecting the opinions of Dr. Neuwelt and Dr.
7  Alvarez.

8  The opinion of a plaintiff's treating physician is ordinarily entitled to substantial weight.
9  *See, e.g., Morgan v. Commissioner*, 169 F.3d 595, 600-02 (9th Cir. 1999).  In fact, according to 20
10 C.F.R. section 404.1527(d)(2), if a "treating source's opinion on the issue(s) of the nature and
11 severity of [one's] impairment(s) is well-supported by medically acceptable clinical and laboratory
12 diagnostic techniques, we will give it controlling weight."

13 Depending upon whether a treating physician's opinion is contradicted, the ALJ must
14 overcome a high burden before rejecting such an opinion.  The ALJ may reject a treating physician's
15 opinion that is contradicted by another physician's opinion only if the ALJ provides specific and
16 legitimate reasons supported by substantial evidence in the record.  *Reddick v. Chater*, 157 F.3d 715,
17 725 (9th Cir. 1998).  However, if a medical opinion is uncontradicted, the standard applied upon
18 review is whether "clear and convincing reasons for rejection" by the ALJ existed.  *Id.* at 725.  Even
19 the rejection of the treating doctor's ultimate conclusions require the ALJ to provide "clear and
20 convincing" reasons.  *Embry v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

21 As an initial matter, the Court finds that because no medical evidence or opinion in the
22 Administrative Transcript contradicted the medical opinions of Dr. Neuwelt and Dr. Alvarez
23 regarding the effect SLE and other ailments had on Plaintiff prior to her DLI, the ALJ must offer
24 *clear and convincing* reasons for rejecting their opinions and conclusions.

25 **1.    Opinions Given at the Request of Plaintiff's Attorney**

26 The ALJ discredited conclusions by Dr. Alvarez and Dr. Neuwelt regarding Plaintiff's
27 functional limitations prior to her DLI because they were written and provided "solely at the

28

7

request" of Plaintiff's attorney. (Tr. at 18.) However, "the mere fact that a medical report is provided at the request of counsel or, more broadly, the purpose for which an opinion is provided, is not a legitimate basis for evaluating the reliability of the report." *Reddick*, 157 F.3d at 726. While Defendant is correct in noting that the Ninth Circuit in *Reddick* did not absolutely prohibit the ALJ from considering the fact that a medical report is solicited by an attorney, other, more important factors must also be present, for example, the existence of contradicting medical opinions or records. *See id*. "In the absence of other evidence to undermine the credibility of a medical report, the purpose for which the report was obtained does not provide a legitimate basis for rejecting it." *Id*. Such additional evidence may include "other records, reports, or findings" in the medical record, but not the ALJ's subjective interpretation of the medical record. *Id*.

Furthermore, Defendant's reliance upon *Burkhart v. Bowen* is misplaced, as that case actually supports Plaintiff's argument. 856 F.2d 1335 (9th Cir. 1988). While the *Burkhart* court allowed the ALJ to draw a negative inference from the medical opinions provided upon request of the plaintiff's attorney, the underlying reason for the ALJ's rejection of the doctor's opinion in that case was that several other treating physicians' opinions contradicted it. 856 F.2d at 1339. Here, unlike in *Burkhart*, no opinion or medical evidence exists in Plaintiff's medical record that contradicted Dr. Alvarez's opinion. The Court finds that the fact that both Dr. Alvarez and Dr. Neuwelt gave their opinions at the request of Plaintiff's attorney, without more, is not a "clear and convincing" reason for rejecting those opinions.

## 2. Objective Clinical Findings

The ALJ also rejected the medical assessments completed by Dr. Alvarez and Dr. Neuwelt because the opinions were "not well supported by objective clinical findings, at least with respect to the period through [Plaintiff's] DLI.." (Tr. at 18.) The ALJ correctly noted that Dr. Neuwelt did not examine Plaintiff prior to her DLI and that Dr. Alvarez examined her only once before then for a sore throat. However, this fact alone is insufficient to find that the doctors' opinions lacked any objective medical support.

The Ninth Circuit has held that "medical evaluations made after the expiration of a

claimant's insured status are relevant to an evaluation of the preexpiration condition." *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988). "Medical reports are inevitably rendered retrospectively and should not be disregarded solely on that basis." *Id.*; *Halasz v. Apfel*, 2001 WL 253225 *5 (N.D. Cal. 2001). Furthermore, Social Security Ruling 83-20 holds that:

> [I]t is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.

In some SLE cases, "only after meticulous evaluation" and elimination of other possible causes of symptoms can a diagnosis of SLE be made. (Tr. at 337.) Although doctors did not conclusively determine that SLE caused many of Plaintiff's inflictions until September of 2001, it does not follow that Plaintiff was not disabled by SLE prior to December 2000.

Once doctors conclusively determined that Plaintiff had SLE, it shed new light on Plaintiff's previous afflictions. As listed in section 14.02, SLE attacks nearly every body part and system, and Plaintiff's medical records prior to her DLI clearly demonstrate that she suffered a slow onset of facial rashes, extensive joint pain, irritable bowel syndrome, sensitivity to sunlight, neuropathy, depression, and extreme fatigue, all listed symptoms of SLE. 20 C.F.R., Part 404, Appendix 1 to Subpart P of the Social Security Regulations No. 4. After diagnosing SLE, even doctors other than Dr. Alvarez and Dr. Neuwelt, such as Dr. White, Dr. Kaye, and Dr. Coulter admitted that her facial rashes and other afflictions prior to her DLI were obviously connected to SLE.

Therefore, the Court finds that Dr. Neuwelt and Dr. Alvarez's opinions are supported by objective evidence, and corroborate the entirety of Plaintiff's medical record. Because no contradictory evidence or medical opinion exists, the fact that Dr. Neuwelt and Dr. Alvarez's opinions of Plaintiff were retrospective is not a "clear and convincing" reason for rejecting them.

**3.   History of Treatment**

The ALJ also based his rejection of Dr. Neuwelt and Dr. Alvarez's opinions on the fact that neither of them had a history of treatment of Plaintiff until called upon by Plaintiff's attorney. (Tr.

9

at 18.) The ALJ gives more weight to treating physicians' opinions, depending on the length and frequency of treatment, as well as the nature of the treatment provided. 20 C.F.R. 404.1527(d)(2)(i-ii). Here, the ALJ asserted that according to the record, Dr. Alvarez only saw Plaintiff once for a sore throat before her DLI, and that Dr. Neuwelt only saw Plaintiff twice in 2003 when making his assessment at the request of Plaintiff's attorney. This assertion by the ALJ, as to the proximity and frequency of their treatment of Plaintiff, evinces the ALJ's scant examination of Plaintiff's medical records.

Dr. Neuwelt has been an active treating physician of Plaintiff since 2001, when Plaintiff was affirmatively diagnosed with SLE and rheumatoid arthritis. He examined her December 28, 2001, at the Rheumatology Clinic of the Highland Hospital, noting her skin condition and high ANA count, and prescribed her medication. "The Ninth Circuit has found a doctor to be a 'treating physician' when the doctor prescribed drugs and saw the patient only twice in a 14-month period." *Halasz*, 2001 WL 253225 at *5. In Social Security forms submitted by Plaintiff in 2002, well before Plaintiff's attorney likely approached Dr. Neuwelt for his opinion in 2003, Plaintiff stated that Dr. Neuwelt had prescribed her Norvasc, Vioxx, and Aspirin for her blood pressure, arthritis, heart, and SLE. (Tr. at 130.) In additional Social Security forms submitted by Plaintiff in 2002, she stated that she sees "Dr. Neuwelt and other doctors in [the] Rheumatology Clinic" four to six times a year for her SLE and rheumatoid arthritis. (Tr. at 148.) Because Dr. Neuwelt is one of Plaintiff's treating physicians, the ALJ's misstatement that Dr. Neuwelt only examined her twice in 2003 at the request of Plaintiff's attorney is not a "clear and convincing" reason for rejecting Dr. Neuwelt's opinion regarding how SLE affected Plaintiff prior to her DLI.

Furthermore, the ALJ's rejection of Dr. Alvarez's opinion because of his minimal history of treatment of Plaintiff prior to her DLI suffers from the same oversight of evidence in the record. Although the ALJ is correct in noting that the record shows only one encounter with Dr. Alvarez prior to Plaintiff's DLI, the ALJ relied upon this fact alone as a "clear and convincing" reason to discredit Dr. Alvarez's opinion. Dr. Alvarez, like Dr. Neuwelt, Dr. White, and others, has actively diagnosed and treated Plaintiff for a variety of ailments, including her SLE. For example, in April

10

2001, less than four months after Plaintiff's DLI, Dr. Alvarez altered the medications prescribed for Plaintiff's skin rashes because of the side effects she was experiencing. He continued to monitor her worsening condition in May 2001, prescribing more medication for her facial rashes. As with Dr. Neuwelt, Plaintiff listed Dr. Alvarez as one of her treating physicians, dating back to 1998. Given that Dr. Alvarez has seen Plaintiff on numerous occasions, treating her for symptoms of SLE, the ALJ's statement that Dr. Alvarez treated Plaintiff only once prior to her DLI for a sore throat is not a "clear and convincing" reason for discrediting his medical opinion regarding the effect SLE had on Plaintiff prior to her DLI.

**4.     The Scope of Expertise**

The ALJ also stated that Dr. Alvarez's "conclusions regarding the claimant's concentration and mental problems during the period in question" were "beyond his field of expertise" and lacked supporting evidence from the period in question. (Tr. at 18.) Supporting this position, Defendant states that Dr. Alvarez is not a psychiatrist and cites *Lombardo v. Schweiker*, 749 F.2d 565, 566 (9th Cir. 1984), for the proposition that, in order to opine on Plaintiff's mental condition, Dr. Alvarez must be a specialist. However, Defendant poorly manipulates the logic from *Lombardo* in an attempt to elevate the ALJ's reasoning to meet the "clear and convincing" standard. *Lombardo* stands for the proposition that when a specialist gives a conflicting opinion to that of the general family physician, then the ALJ usually gives greater weight to the specialist's opinion. *Lombardo*, 749 F.2d at 566.

There is simply no existing authority permitting an ALJ to discredit a general physician's opinion regarding a patient's mental state when no conflicting report or opinion exists simply because the physician is not a psychiatrist. In fact, as a "duly licenced physician," Dr. Alvarez is fully entitled and qualified to give a medical opinion regarding Plaintiff's "mental state as it relates to her physical disability" even though he is not a psychiatrist. *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). Furthermore, given his involvement (unacknowledged by the ALJ) in treating Plaintiff's SLE, Dr. Alvarez would have had experience with the mental effects of SLE on Plaintiff. Accordingly, this is not a "clear and convincing" reason for discrediting Dr. Alvarez's opinion.

11

1  **5.     Summary of the Medical Opinions**

2       Regardless of how much weight the ALJ should have given Dr. Alvarez and Dr. Neuwelt's

3  opinions, the ALJ's conclusion that Plaintiff's SLE was not wholly disabling prior to her DLI lacks

4  support in the available medical evidence.

> In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available . . . How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment must have a legitimate medical basis. At the hearing, the ALJ should call on the services of a medical advisor when onset must be inferred.

9  1983 SSR LEXIS 25, No. 83-20. Accordingly, the Court finds that the ALJ improperly rejected the

10 medical opinions of Dr. Neuwelt and Dr. Alvarez.

11 **C.     Treatment of Plaintiff's Subjective Complaints**

12      Plaintiff argues that the ALJ incorrectly discredited her testimony and statements regarding

13 her symptoms and limitations. Defendant argues that the lack of objective findings in the medical

14 record and the infrequency of Plaintiff's complaints to her doctors led the ALJ to correctly reject

15 Plaintiff's testimony.

16      If an ALJ determines that a plaintiff's subjective complaints are not credible after the

17 plaintiff has already produced medical evidence of an underlying impairment, the ALJ must identify

18 what testimony is not credible and point to specific evidence undermining the plaintiff's complaints.

19 *Reddick*, 157 F.3d at 722. Because Plaintiff produced medical evidence of underlying impairments

20 consistent with her complaints, and there is no affirmative evidence that she is malingering, the

21 ALJ's reasons for rejecting Plaintiff's testimony must be clear and convincing. *See Regennitter v.*

22 *Commissioner*, 166 F.3d 1294, 1296 (9th Cir. 1999).

23      Initially, the ALJ improperly discredited Plaintiff's hearing testimony because he felt it was

24 not supported by objective medical findings. However, an ALJ may not discredit a plaintiff's

25 testimony as to the severity of symptoms merely because it is unsupported by objective medical

26 evidence. *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991). The ALJ rejected Plaintiff's

27 testimony regarding suffering from numbness in her hands, arms and feet because she only

12

mentioned it once to doctors before her DLI.  This by itself, is an insufficient reason for rejecting Plaintiff's testimony that she suffered regularly from numbness.  In fact, no where in the record is there any evidence that Plaintiff did not suffer from numbness and neuropathy.  Without specific evidence in the record showing Plaintiff did not suffer from numbness as she testified, the ALJ cannot summarily reject her testimony.

Additionally, the ALJ discredited Plaintiff's hearing testimony because he felt she only received routine outpatient care with the exception of her knee surgery.  Plaintiff argues that the treatment she received for her feet, her facial rash, and her hypertension were not "routine."  Defendant neglects to define "routine outpatient care" and fails to refute, with specific evidence, Plaintiff's contentions that she received care that was beyond "routine."  Furthermore, the ALJ failed to cite specific evidence to support his "routine outpatient care" findings.  Without any specific reasons cited by the ALJ or Defendant, this Court is inclined to agree that Plaintiff did not receive only "routine outpatient care."  Even if the ALJ was correct, the mere fact that Plaintiff received only "routine" care is not a clear and convincing reason supported by specific evidence which undermines Plaintiff's subjective complaints.

Finally, the ALJ discredited Plaintiff's testimony based on his observations of her during the actual hearing in October 2003.  He noted that she cried only once and did not struggle to remember answers to his questions, which the ALJ claimed supported his contention that she did not suffer from cognitive problems or depression before 2001.  However, a review of the transcript from Plaintiff's hearing reveals that she struggled to remember the ALJ's line of questioning several times.

Regardless, aside from lacking any specific evidence from the record to support his contention that her objective statements lacked credibility, the ALJ made his determination that Plaintiff did not suffer from depression or mental impairment from SLE before her DLI based on a 15 minute hearing three years later.  The Court finds it ironic that the ALJ is willing to reject Plaintiff's testimony and find that she was able to work prior to her DLI based on a short hearing in October 2003, and yet rejects corroborative medical opinions about Plaintiff from her treating

13

1  physicians, who treated her before and after her DLI, because they were formed in 2003 rather than
2  before her DLI.  Although the ALJ stated that he did not base his entire credibility assessment upon
3  her appearance at the hearing alone, that is exactly what he did.  The ALJ failed to provide a clear
4  and convincing reason for rejecting Plaintiff's testimony supported by specific evidence in her
5  medical record.

6  In sum, the Court finds that the ALJ's reasons for discrediting Plaintiff's testimony were not
7  clear and convincing, nor supported by specific evidence in Plaintiff's medical record.  The ALJ did
8  not, and cannot, point to one inconsistency between Plaintiff's testimony and the entirety of her
9  record.  Accordingly, the ALJ erred when he rejected Plaintiff's subjective complaints and testimony
10 regarding her condition prior to her DLI.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is **GRANTED** and Defendant's motion is **DENIED**.  The case is **REMANDED** for a re-examination of the record beginning at step two of the five-step sequential process, with proper consideration given to the nature of the disability in question.

**IT IS SO ORDERED.**

Dated: June__1__, 2005

/s/
MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE

APPROVED
Judge Martin J. Jenkins